The court did not err in overruling the motion for a new trial, for the reasons given in the body of the opinion.
 DECIDED JULY 15, 1949. REHEARING DENIED JULY 28, 1949.
The defendant was convicted on an indictment which charged, omitting the formal parts, as follows: "Gene Oglesby, alias O. *Page 772 
C. Oglesby, of the county and State, with the offense of a misdemeanor, for that the said Oglesby on November 13, 1947, did unlawfully by deceitful means and artful practices, and by false representations as to existence of liens on personal property, cheat and defraud R. Q. Wilkes and Oren Wilkes, then doing business as a copartnership under the trade name of Wilkes Pontiac Company, in and to the amount of $700, for that the said accused on the day and date aforesaid, proposed to buy from said Wilkes Pontiac Co. a certain truck, agreeing to pay therefor the sum of $700, the accused, in order to pay for said truck, falsely and fraudulently represented to the said Wilkes Pontiac Company that he was the owner of a certain 1941 model, Tudor, DeLuxe, used Ford automobile, Motor No. 18-6022960, and that said automobile was not subject to any lien and was his unincumbered personal property, and he, the said accused, proposed to refinance said used automobile by selling it to the said Wilkes Pontiac Company, giving his unconditional sale contract therefor so as to enable the said Wilkes Pontiac Company to transfer such contract to a finance company and obtain thereon the purchase-price of said truck, $600; whereupon the said Wilkes Pontiac Company, relying upon the representations of the accused as to his ownership of said automobile and the non-existence of liens thereon as true, did then and there take over said automobile from the accused and did resell same back to him, and did then and there take from him a conditional-sale contract retaining title over said automobile, showing an unpaid balance of $600 with insurance and finance charge to the amount of $163, and upon this being done, the said Wilkes Pontiac Company delivered said truck of the value of $700 over to the accused, also the automobile above described, and thereafter transferred the said conditional- sale contract to General Finance and Thrift Corp., receiving thereon the $600, on the selling price of the said truck. Later it was discovered by Wilkes Pontiac Company that the accused had, on the 26th day of June, 1947, made to Twin States Motor Company, of Augusta, Georgia, a conditional-sale contract over said automobile securing an unpaid balance of purchase-price in the sum of $874.95, under and pursuant to which the holder repossessed and recovered said automobile from the said accused, thereby making it necessary for the said Wilkes *Page 773 
Pontiac Company to pay to the assignee of the sales contract executed by the accused on November 13, 1947, the sum of $700, to the loss and damage of the said Wilkes Pontiac Company in the said sum of $700. At the time of making the false representations as aforesaid, the said accused knew that they were false, knew that there was an outstanding conditional-sale contract over said automobile and that he was not the owner thereof and that the same was subject to the then unpaid conditional-sale contract as foresaid; he made the said false representations falsely and fraudulently to the said Wilkes Pontiac Company for the purpose of cheating and defrauding said Wilkes Pontiac Company, and the said Wilkes Pontiac Company, not knowing the representations were false, but believing them to be true, acted upon them and was cheated and defrauded in and to the amount of $700."
The defendant made a motion for a new trial on the usual general grounds and six amended grounds.
R. Q. Wilkes, the prosecutor, testified: "On the 13th day of November, 1947, my son, Oren Wilkes, who is now dead, and I were engaged in the business of selling automobiles and trucks here in Lyons, Toombs County, Georgia. We were partners in the business and we did business in and under the trade name of Wilkes Pontiac Company. At that time I did not know the defendant here, O. C. Oglesby, who I now understand goes under two names, O. C. Oglesby and Gene Oglesby. On that day he came to our place of business and wanted to buy a truck, but he did not have the money to pay for the truck. He was not in position, so he said, to pay any portion of the purchase-price. It was a second-hand truck and we priced it to him at $700 and it was well worth that amount. At that time we were selling notes and sales contracts taken by us over automobiles, where they were sold on time basis, to General Finance and Thrift Corporation, but we could not handle a contract over this truck, so as to realize $700 on it. The defendant, O. C. Oglesby, that was the name which he traded with us, had with him a Ford automobile, two-door sedan, 1941 model, Motor No. 18-6022960, which was a pretty good automobile, and would finance for enough to enable him to buy the truck. He offered to use this automobile in such a way as to enable us to sell him *Page 774 
the truck on credit. I asked him if the automobile was his, and he said it was, and I asked him if it was fully paid for and he said that it was and that there was no lien of any kind over it. He appeared to be telling the truth and believing that he was telling the truth about the title to the automobile being clear we agreed with him that we would buy the car, that is the automobile, from him and then sell it back to him and take a reservation-of-title contract and note over it for such an amount as would enable us to sell the paper and realize thereon the sum of $600, and then take a paper over the truck for $100. To this he agreed. We then bought the automobile from him and immediately sold it back to him, and had Miss Gladys Stanley who represented General Finance and Thrift Corporation to fix up this paper dated November 13, 1947, for $763.80, this paper being a note and a conditional-sales contract retaining title to the automobile, being a Ford Tudor, used automobile . . 1941 model; and the note and contract showing an unpaid balance of $600 of the purchase-price and insurance, and finance charge being $163.80. We then took a showing over the truck for $100. We then delivered to Oglesby the truck and the automobile and he left with them. We immediately sold the automobile conditional-sales contract and note to General Finance and Thrift Corp., for the $600, and endorsed the papers to them with recourse. Soon thereafter Oglesby came back and paid the $100, for which he had given the paper over the truck, and we delivered the old paper over to him. Some days later a telephone call came in from Graymont, Georgia, and some person there was wanting to know if we held any papers over the truck, saying that Oglesby was offering to sell it there, I told the party that our note for the $100 over the truck had been paid, and that we had nothing against the truck, so he must have sold the truck. I have not seen it any more.
"Some time later General Finance and Thrift Corporation, to whom we had sold the automobile note on the same day that the trade with Oglesby was made, and to whom we had endorsed the note with recourse, received therefor the sum of $600, made known to us that at the time we traded with Oglesby they held a reservation-of-title contract given by the defendant under the name of Gene Oglesby to Twin States Motor Company Inc. of *Page 775 
Augusta, Georgia, securing the payment of $874.95, this paper being over the same automobile over which we took our paper. A representative of General Finance and Thrift Corporation later called upon us and produced the note and reservation-of-title contract which Oglesby had given to Twin States Motor Company Inc., which note and contract had been transferred properly, and which showed that it had been recorded in Emanuel County, the county of the defendant's residence, on July 16, 1947, and also produced a paper signed by Oglesby, showing that on December 8, 1947, he, Oglesby, had surrendered the automobile on the older paper. Then there was nothing for us to do but to pay General Finance and Thrift Corporation for the note and contract we had sold to them. We paid them the $600 we had gotten from them and $100 on the insurance and finance charge, making the total paid to them $700, even though the full amount of the note and contract was $763.80. This payment was made in money or check, I don't remember which. As a result of his false representations to us to the effect that the automobile was his and clear of liens, which representations were false, and which we acted upon as true, we lost the sum of $700."
Upon cross-examination, the same witness testified: "At the time of this transaction with the defendant Oglesby, Mr. J. E. Byrd was working with me and my son, Oren Wilkes, who is now dead. I think the defendant had talked with them about the trade before he came to where I was, but when he came to where I was the trade was finally made and the papers fixed up just as I have related. He did not tell me that there was a lien over the automobile. He told me emphatically that there was no lien of any kind over it, and that it was his and the title clear. If he had told me that there was an outstanding lien over the car, we certainly would not have traded with him. As to the word `refinance' being used in the indictment, the solicitor writes out the indictments, and regardless of what you call it, I have told you just what was said and done and how the trade was made."
J. E. Byrd testified for the State substantially: The defendant first talked with Oren Wilkes and the witness about the trade of the defendant with R. Q. Wilkes of the partnership. The defendant *Page 776 
told the witness that he owned the automobile in question, that the titles were clear, that there were no liens, and that it was fully paid for; and afterwards he "told all three of us the same thing." And further: "He never told us about any other paper being on the automobile. He told all of us all the time that there was nothing against the automobile."
J. E. Jones, testified for the State as follows: "I am field man for General Finance and Thrift Corporation. I look after collections for them and in doing so I have to do considerable traveling, checking up on and collecting automobile papers purchased by them. After they bought from Wilkes Pontiac Company the note and contract here exhibited to me, given by O. C. Oglesby to Wilkes Pontiac Company over Ford automobile, Tudor DeLuxe . . which paper bears date of November 13, 1947, and is for $763.80, no payments were made on the paper, and I went to Emanuel County to see what the trouble was. When I found the defendant here I learned that he was the same man from whom I had already recovered an automobile. And then when I compared papers I found that the automobile described in the Wilkes Pontiac Company paper was the same automobile that I had recovered from this defendant on December 8, 1947, under a paper which he had given to Twin States Motor Company Inc., on June 26, 1947, and signed as Gene Oglesby. The note and sales contract dated June 30, 1947, signed by Gene Oglesby, securing the payment of $874.95, which I now hold in my hand is the note and contract under which I recovered the automobile, and this release signed by Gene Oglesby, dated December 8, 1947, releasing 1941 Ford automobile . . is the release he signed when he delivered the automobile to me on December 8, 1947. At the time we bought the paper from Wilkes Pontiac Company we already held the older paper which had been given to Twin States Motor Company Inc., but the names signed to the two papers were different, and there was no occasion for us to compare the papers and discover that they covered the same automobile until we set about to collect the Wilkes Pontiac Company paper. The older paper, that is the one to Twin States Motor Company Inc., was outstanding and unpaid on the date that the Wilkes Pontiac Company paper bears, November 13, 1947. After discovering that the automobile *Page 777 
described in the Wilkes Pontiac Company paper had been repossessed by my company under an older paper, I then called the Wilkes Pontiac Company for payment of the paper they had endorsed to us with recourse, and, after a check-up on the papers, Wilkes Pontiac Company paid us and took back the note and contract signed by O. C. Oglesby dated November 13, 1947. The Wilkes Pontiac papers, the Twin States Motor Company Inc. papers, and the release I hold dated December 8, 1947, all relate to and described the same automobile giving the same motor number."
The Sheriff of Toombs County testified that he knew the defendant, that the defendant goes under both the names O. C. Oglesby and Gene Oglesby, and that he had given the sheriff appearance bonds under each name. There were admitted in evidence, without objection: a note and reservation-of-title contract signed by O. C. Oglesby to Wilkes Pontiac Company, dated November 13, 1947, on the automobile in question to secure the payment of $763.80, endorsed and transferred to General Finance and Thrift Corporation, by Wilkes Pontiac Company; also a note and reservation-of-title by Gene Oglesby to Twin States Motor Company Inc., transferred to General Finance and Thrift Corporation, by Wilkes Pontiac Company; also a note and reservation-of-title by Gene Oglesby to Twin States Motor Company Inc., transferred to General Finance and Thrift Corporation, and recorded in Emanuel County July 16, 1947; also a release signed by Gene Oglesby, dated December 8, 1947, showing that on that date he released to General Finance and Thrift Corporation the automobile in question; also two appearance bonds identified by the Sheriff of Toombs County as bonds given to him by the defendant, one being signed by the name "O. C. Oglesby" and the other by the name "Gene Oglesby."
The defendant made the following statement: "I bought the truck from Mr. Wilkes, and I had done told his boy and the other man with him, Mr. Byrd, that I owed some on my automobile, and then I told Mr. Wilkes that there was a paper over it and that I owed some on it, but they said they could fix that up all right. They said something about I could sell them the automobile, and they would sell it back to me and take a paper over it, and I could pay them for the truck. A lady fixed the papers and I signed them. I was giving $700 for the truck, so they made two papers, one paper over the car and another paper *Page 778 
over the truck for $100. I paid the $100 later on and sold the truck. I never did pay the paper I gave over the car because I didn't have the money to pay it. The man come from Augusta and I let him have the car. That's about all I know about it, but I told Mr. Wilkes that the car was not paid for and I owed some on it."
In addition to the usual general grounds, the first special ground assigns error because, while R. Q. Wilkes was testifying as to the money he had lost on the automobile on which the defendant had given him a lien, and on which he had given his firm a lien, which had been transferred to the General Finance and Thrift Corporation, with recourse, the witness stated that he paid the amount of that lien by check or money, he did not remember which. Counsel for the defendant moved to rule out the testimony with reference to the payment, because if it were a check, the check would be the highest and best evidence. The court overruled this objection.
The sixth special ground assigns error because the court overruled a motion of the defendant for a directed verdict.
Special grounds 2, 3, 4, and 5 are but amplifications of the general grounds.
The general grounds, and special grounds 2, 3, 4, and 5 will be considered together.
It is argued that there is not sufficient evidence to sustain the conviction, in that no loss is proved, and no intent to defraud is proved; that the evidence, being partly circumstantial, is insufficient to convict the defendant beyond a reasonable doubt. We have set out the evidence practically in full, and it shows that the general grounds and the special grounds in amplification thereof are without merit. The evidence is amply sufficient to support the verdict.
As to special ground 1, under the facts of this case it seems clear to us that, if we consider that the check was the highest and best evidence, the defendant could not have been harmed by the introduction of this testimony. This is true for the reason that the defendant in his statement did not deny giving a lien on the automobile, but admitted it. He did not deny that *Page 779 
there was a lien against the automobile for the amount shown by the retention contract itself, which was introduced in evidence; but his only contention was that the prosecutor knew that the lien was outstanding against it because he, the defendant, so informed the prosecutor, R. Q. Wilkes, as well as the son of Wilkes and the witness Byrd. There was an issue as between the defendant's statement and the testimony of the witnesses for the State as to whether the defendant informed the prosecutor as to the existing lien, but there was no issue as to the fact that there was a lien outstanding and that the prosecutor had paid the same. The jury disbelieved the defendant's statement to the effect that the prosecutor knew that there was an outstanding lien against the car in question.
The court did not err in overruling the motion for a directed verdict, as contained in special ground six.
The court did not err in overruling the amended motion for a new trial for any of the reasons assigned.
Judgment affirmed. MacIntyre, P. J., and Townsend, J., concur.